(C.D. 2476)

CHONG KEE JAN Co., INC. v. UNITED STATES

United States Customs Court, Third Division

(Decided August 10, 1964)

*Lawrence & Tuttle* (*George R. Tuttle, Jr.*, of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Harold L. Grossman, Andrew P. Vance*, and *Herbert L. Warren*, trial attorneys), for the defendant.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: For many years and under various tariff enactments, the issue has been litigated as to the tariff classification and duty rates appropriate for imported vegetables that have been processed, in varying degrees, with salt. That is the issue again litigated here.

These are conceded to be vegetables. They are from Hong Kong and are more particularly described as Chinese vegetables. What is controverted, is the collector's classification of these vegetables as vegetables that were prepared or preserved in some way other than by pickling or by packing in salt, brine, or oil, and which are not specially provided for. The classification provision is paragraph 775, Tariff Act of 1930. The duty assessed was at the rate of 35 percent ad valorem.

The protests present an assortment of claims, only one of which is prosecuted. That is a claim that was added by protest amendment (R. 2), as follows:

We further claim that the assessment of duty of 35% ad valorem on the items described below under paragraph 775 as other vegetables prepared or preserved, is illegal or void, and that these items are properly dutiable at 17½ percent as vegetables pickled or packed in salt or brine under paragraph 775, as modified by T.D. 52476 and T.D. 52373, the items being as follows:

> Pres. Radish
> Preserved Turnips (Chung Choi)
> Canned Pres. Radish
> Preserved Turnips (Jar Choi)
> Canned Turnips (Jar Tsoi)
> Canned Radish Sliced
> Pres. Mustard (Mui Choi Sam)
> Preserved Turnips (Chung Tsoi Tau)

The two tariff provisions involved are as follows:
Paragraph 775, Tariff Act of 1930:

Vegetables (including horseradish), if cut, sliced, or otherwise reduced in size, or if reduced to flour, or if parched or roasted, or if pickled, or packed in salt, brine, oil, or prepared or preserved in any other way and not specially provided for; * * * 35 per centum ad valorem * * *.

Paragraph 775, Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373:

Vegetables (including horseradish), if pickled, or packed in salt or brine and not specially provided for (except cucumbers and onions)_____17½% ad val.

The merchandise of the two entries of this protest was imported at San Francisco on February 21, 1955, and April 6, 1955. Due to delay in bringing the issue to trial (there have been two successive suspensions at plaintiff's request), the problems of proof seem to be more than usually difficult. No merchandise of these importations was available to be produced on trial, according to counsel. Specimens offered, each of which was accepted into evidence by the presiding judge "for what it is worth" (exhibits 1 to 6, inclusive), are objected to by defendant as not having been shown to be actually representative of the merchandise in issue. There is something to be said for defendant's point.

Moreover, evidence as to the method of processing these vegetables is less than sufficient. The only evidence in the record as to processing in Hong Kong of the vegetables of exhibits 1 to 6 (and, but by inference only, of the vegetables of this importation), is found in the testimony of plaintiff's witness, Mr. Hing Tin Siu. Mr. Hing's experience, on which his testimony was based, was limited to personal observations he made during a visit of 2 or 3 hours to the processing plant in Hong Kong. Obviously, that could not have been long enough for personal observation of a process that is conceded to require considerably more than 2 or 3 hours. To be sure, he said he was told certain things in Hong Kong that he did not personally observe, and he "guessed" certain other things as to processing, but these are statements difficult to accept as evidence of the facts so ascertained.

In consequence, the expert witness whose testimony plaintiff adduced found it difficult to give expert opinion on the basis of the processes as described by Mr. Hing.

With these serious limitations in mind, let us proceed to review the record before us.

Mr. Hing saw exhibit 1, identified as sliced preserved radish (Chit Choi Pein), processed before canning by washing, slicing, salting "a couple of days" (although he was there only 2 or 3 hours), and drying out. He would "guess" the radish was salted a couple of days, because he was told this by the processors. (R. 39.) Addressing himself to "this material," apparently exhibit 1, Mr. Hing stated that it is put into a tub and salted, layer upon layer, vegetable and salt. (R. 40.) The vegetable stays in the tub for "several" days, during which the natural juices are drawn out. The vegetable is then removed and allowed to dry out. (R. 41.) After it is dried, the vegetable is packed in cans or bags. There are assertions of counsel indicating that the merchandise of this litigation was imported in large, tin-lined boxes. (R. 47, 176.) Clearly these assertions of counsel are not proofs. Mr. Hing did not know if anything was put into the can

with the vegetable. All that he saw put in the can, was the vegetable. Much of what he testified to, as to processing, was told to him during the brief 2- or 3-hour visit he made to the processing plant. What he himself observed was not a continuous process, but phases only. (R. 41.) Exhibit 1, so Mr. Hing testified, *can* be eaten as it is taken out of the container, but most people would prefer first to wash it. Drying and salting are done as a flavoring and preserving process, he said. (R. 42.) This is done in big barrels or large crockeries and more recently, as he observed, in cement tubs or tanks. (R. 36.) Some vegetables are sliced after drying and before canning. Others are wrapped into a ball shape before canning. (R. 35.)

As to exhibit 2, identified as canned preserved radish (Chit Choi Poo), Mr. Hing said that he had visited the plant of Tung Chung Co., where exhibit 2 was processed, but that he observed only the canning process. (R. 37.) Notwithstanding, he later testified that he saw exhibit 2 processed by salting, drying, and canning. (R. 43.)

He never saw and so could not testify as to the processing of exhibit 3, identified as canned preserved turnip (Jar Tsoi).

Mr. Hing identified Chung Choi, described as sliced preserved turnip (exhibit 4), as a leafy vegetable that is salted, dried, sliced, and wrapped into a ball shape. (R. 45.) Chung Choi is processed in the same way both for consumption in China and for export except that for export it is dried longer in order that it will keep longer. (R. 46.)

The same basic processes of drying, salting, and packing were observed by Mr. Hing in connection with exhibit 5, described as preserved mustard (Mui Choi Sam), and exhibit 6, described as sliced preserved turnips (Chung Tsoi Tau). (R. 47, 49.)

Summarizing his testimony, Mr. Hing said that he observed merchandise similar to exhibits 1, 2, 4, 5, and 6, being sliced, dried, and salted; that as to the length of the salting period, he was "told" that in good weather the salting was for a shorter period, in order to take advantage of good drying weather, than when the salting was done in the rainy season; and that, generally speaking, there was no difference in the processes he observed as to the five exhibits 1, 2, 4, 5, and 6. (R. 50.)

United States Customs Laboratory analysis of exhibits 1 to 6, inclusive, were introduced into evidence. (Exhibits 7, 8, and 9.) Both parties adduced expert testimony from members of the faculty of the University of California, as to the processes of pickling vegetables.

Dr. Reese Haskell Vaughn, professor of food science and technology, and food technologist in experimentation at the University of California, testified for plaintiff. With the university since 1936, and a professor since 1953 or 1954 (R. 69), his activities have involved

him in food fermentation and food preservation studies, and in teaching and research. He has done consultant work for the olive industry; on dehydrated vegetables; and on concentrated orange juice. He holds degrees in food bacteriology. He has done work under a research grant from the National Pickle Packers Association, and is involved in basic research on the softening problems connected with cucumbers and other types of fermented products, peppers, capers, mushrooms, beans, and sauerkraut. (R. 72.) He has written and published material on the pickling of vegetables.

Dr. Maynard A. Joslyn, professor of fruit technology, also at the University of California, testified for defendant. He received the degree of bachelor in chemical engineering in 1926, master of science in agricultural technology in 1928, and doctor of philosophy in chemistry in 1935, all from the University of California. In 1930, he was director of research and manager of production for plants of the National Dairy Products Corp. in Florida. He was consultant on food processing in middle eastern Europe from 1958 to 1960. He has published 300 scientific and professional articles, in journals; and six books, including a text on food analysis and books on the science and technology of food processing. He was in China in 1945 in charge of procurement, development, and distribution of supply to military allies of the United States.

Both of these witnesses testified as to pickling, but in somewhat different context. Dr. Vaughn, for plaintiff, testified on the basis of certain tests in which he was involved, to determine the pickling process of olives and cucumbers. He said:

* * * these are all preserved by a combination of salt and lactic acid. During the addition of salt, either in a dry form or in brine, the time the product is harvested and put into process, and the salt causes a change in the atmospheric pressure of vegetable or fruit system, and it unleashes sugar material out of the cells into the—well you could call it a microclimate if you want in connection with dry salt—or into the liquid in connection with wet salting or brine, and the lactic acid bacteria which are present everywhere where you have vegetables or fruits, they start to convert the sugar to lactic acid and acetic acid, and in the control of these fermentations we normally follow the production of total acid, and if we're doing some work we very frequently determine lactic acid per se. In addition, we check the pH—that's another method of telling this acid being developed—and also try to control the salt concentration. [R. 74, 75.]

Dr. Joslyn, for defendant, testified that the term pickling, or pickled, is used in a wide variety of ways in the literature of food science and technology. In this context he said:

* * * Traditionally, pickling was the art of preserving vegetables, fish, and meat, in the solution of salt or vinegar. It implied that the product to be preserved either underwent a material lactic acid fermentation, or was placed in a salt solution of sufficiently high concentration of salt to inhibit microbial deteri-

oration, and any enzymatic or other chemical changes that the food product would be likely to undergo. Today in the United States pickling is used more as a method of converting raw material to products of desired flavor, rather than as a means of preservation, so that our processes of pickling have materially changed. However, we do recognize essential differences between the steps and processes commonly used. A vegetable may be preserved by lactic acid fermentation, if it is placed in the salt solution that was diluted enough to allow for the growth and activity of the lactic acid organisms. This is characteristic, for example, in the conversion of shredded cabbage into sauerkraut, where a lactic acid fermentation occurs in the medium containing approximately 2½ per cent of salt. This is also true of the lactic acid fermentation of cucumbers, pickles. They're placed in a brine solution of about 5 to 6 per cent. It's true, also, of the so-called Spanish green olives fermentations. Now, in this process the fermentable sugars which are present in the vegetable tissue which would support the growth of undesirable spoilage organisms are converted into lactic acid, which is a more stable compound, and which also has some preservative values of its own. This is a true fermentation process of pickling.

In addition, however, we recognize the possibility of storing vegetables in salt solutions of higher concentration of salt, at which the activity of the lactic acid bacteria may be inhibited or actually prevented, and in which the process of fermentation is secondary to the preservation of the food, so that the preservative qualities of the product are more dependent upon the salt that is added to the vegetables during the preparation of the salt stock. Now, this enables the producers of pickles to store vegetables under commercial conditions from one harvesting season to another, and to allow the transportation of vegetables from the point of growth to the point of processing. The salt stock is converted into the commercial pickle by a process of leaching out the excess salt, and curing the vegetable tissue either in vinegar, or in the sweetened vinegar, or in the spice and sweetened vinegar, depending upon the objective to be met.

In addition to these processes, salt has long been used as a method of preserving foods of both animal and vegetable origin. In this case, the concentration of the salt that is added to the product is sufficiently high to check all microbial activity, and to completely preserve the product itself. We do this, for example, in the dry salting of fish, codfish, on the Atlantic coast, and this was at one time done in the curing of hams and bacon, and other pork products, by the so-called corning method, but as I pointed out today we use this process, particularly with pork products, only as a means of developing flavors, not as a means for preserving the product.

Now, when we had the problem of distributing perishable supplies in World War II, particularly for use in the tropics, it was found that the ordinary products that were preserved by packing with dry salt, or curing in the salt brine, were not preserved sufficiently to meet our storage demands, and therefore we developed the so-called tropical cure process, in which a product like pork or ham would be stored initially in a brine of high salt content, and then actually packed in shipping cases with dry salt, so that as it was received by the troops in the forward areas, it was completely surrounded by crystals of salt that prevented any possible spoilage of the commodity, and thus necessitated a secondary method of pre-treatment before actual use. [R. 124, 125, 126, and 127.]

These expert witnesses differed considerably in their opinions as to exhibits 1 to 6, inclusive. Dr. Vaughn described how a dill pickle is fermented in the United States. (R. 77.) He then alluded to Mr.

Hing's testimony, and testified that the processing Mr. Hing had described had—

* * * certain similarities between this radish or turnip pickling, salting, as was described by the prior witness, and what goes on in this country in connection with the dry salting of cucumbers as I orally just described, or the dry salting of pimentos that are ultimately used for stuffing or for flavoring in certain types of meat products that are produced in this country, and with certain mixed vegetables that are salted, although the vegetables are not turnips or radishes. Beans, carrots, things like that, sometimes they would be dry salted. [R. 79.]

The only similarity he could pinpoint, however, was the addition of salt to cause dehydration. Based on the Government analyses (exhibits 7, 8, and 9), Dr. Vaughn stated "with certainty" that exhibits 2, 3, and 5 were *pickled* in a process of lactic acid fermentation. (R. 80, 81.) On the same analyses, he testified that all six exhibits are *salted*, some very heavily.

On cross-examination Dr. Vaughn admitted that, based solely on the reports of Government analysis, it would be impossible to determine whether or not exhibits 2, 3, and 5 were pickled in lactic acid. (R. 104.) He was of the opinion, however, that exhibits 2, 3, and 5 had been fermented in lactic acid, although that would not preserve them indefinitely "if it wasn't for the salt and dehydration." (R. 103.) Dr. Vaughn further testified that the period necessary to ferment a product in lactic acid, in order to preserve it, is a question of chemical control, but that a product would still be considered fermented in lactic acid although it was primarily preserved by salt and dehydration. (R. 102.) According to Dr. Vaughn, the mere addition of salt would not cause a vegetable to become pickled, but salt sets up conditions conducive to lactic acid fermentation. (R. 107.)

Dr. Joslyn agreed with Dr. Vaughn that exhibits 7, 8, and 9 gave little basis for expressing an opinion as to whether the vegetables were fermented in lactic acid. He testified that, on the basis of the laboratory analyses, he could not give an opinion that exhibits 1 to 6, inclusive, had undergone true lactic acid fermentation in brine, or whether they had been preserved either by storage in a concentrated salt solution, or a combination of salting and subsequent drying. (R. 135.) If anything, the analyses indicated to him that it was unlikely that there was lactic acid fermentation. To give a firm opinion, he would have to know the exact processes through which the vegetables were put, prior to canning. (R. 139.) He stated that, under normal conditions, to process a vegetable in salt, then dry it, is not conducive to the onset of lactic acid fermentation. (R. 153.) He could not say whether exhibits 1, 2, and 3 were fermented in lactic acid, but the described salt concentrations seemed to him too high for lactic

acid fermentation to have occurred. (R. 155.) He would call those vegetables dry pickle products. However, pickling as a process of preserving means only a process of lactic acid fermentation. (R. 149, 160.)

He distinguished between pickling as a process of preservation, as in sauerkraut and dill pickles; and the more popular practice, where lactic acid is not essential (R. 149), of pickling for flavor by treating fresh vegtables with solutions containing salt, vinegar, sugar, or spices. (R. 129.) Dr. Joslyn testified that it was not the usual practice in the United States to pack dry a lactic acid fermented product, but that some oriental lactic acid fermented vegetables were packed dry. (R. 154.)

Dr. Joslyn was of the opinion also that the definition of pickling stated in the Encyclopaedia Britannica, *i.e.*, "a general term meaning to preserve in salt, acid, sugar or any combination of them" was too broad; that it failed to differentiate between pickling processes in terms of objectives and, in effect, "includes everything under the sun," including exhibits 1 to 6, inclusive. (R. 162.) Explaining his pamphlet about pickling, entitled "Home and Farm Preparation of Pickles, California Agricultural Extension Service Circular 37" (exhibit 11), Dr. Joslyn said that it included procedures for the preservation of products which were not pickled in the sense of lactic acid fermentation. (R. 150.)

Dr. Joslyn returned to the central theme of his testimony, that "pickling" is a question of identifying how a product is processed. A pickle fermented in brine solution has to remain there, stored under conditions which promote lactic acid fermentation; it ferments in the lactic acid and then undergoes a process by which it is converted into an edible pickled product. (R. 169.) A product pickled for preservation may or may not be edible without further processing, as sauerkraut. To a great extent, the meaning of "pickled," even in 1930, was determined by the interests of the writer and his audience. (R. 170.) "Circular 37 [exhibit 11] which * * * [was] prepared for home and farm use, was written for a particular audience that had to be educated in elementary principles of food preservation, and given directions for the preparation of a variety of pickles. Just in the same way, the authors of the available text in the field * * * vary in the meaning which they attach to pickling. However, technologically, the term as used in the United States refers to the production of the brine-cured or fermented vegetables that would be marketed in an edible form, usually a liquid packing medium." (R. 170, 171.)

While certainly there is some room for questioning the weight properly to be ascribed to some of the facts of record, it is our opinion that, even if they were adequate as proofs of the facts asserted, they do not establish the classification which plaintiff claims.

In the first place, there are no proofs showing how the canned turnips (Jar Tsoi, exhibit 3) are processed. Witness Hing was clear, however, that he had no knowledge as to its processing.

As to the other five items (exhibits 1, 2, 4, 5, and 6), the testimony, at best, shows that the vegetables are sliced, salted, and dried. Any testimony there is as to the amount of salt or the period of salting, is indeed both slight and vague.

The tariff classification which plaintiff urges requires a finding, either, that the imported vegetables are pickled, or that they are packed in salt. The claim that they are packed in brine was abandoned; and if it had not been abandoned, it could not be sustained on the record which is before us. It remains for us to decide whether these vegetables, as imported, are either packed in salt or are pickled. The record does not show that they were *packed* in salt, although there is some *argument* that the vegetables were impregnated with salt to the point of saturation. We do not understand that this is necessarily the equivalent of "packing" in salt. Moreover, proofs are inadequate to support that argument. They fail to show more than that salt crystals could be observed on the exterior of the vegetables as imported. This is not tantamount to saturation with salt, even if proofs of saturation were material to the issue of packing. Of that we are not convinced.

What plaintiff appears to rely on is a claim that these vegetables were pickled by the use of salt in the processing in Hong Kong, contending that the salt used in processing created lactic acid and that this lactic acid pickled the vegetables, for purposes of tariff classification.

It seems to us clear that Congress intended, in enacting paragraph 775, to provide specifically for two different forms of preparation, or preservation, that is, *either pickled or packed in salt* or in other enumerated substances. There is nothing to suggest that Congress intended to say that mere salting, or even packing in salt, is the process known as pickling, an alternative process to that of packing.

In determining what Congress intended to embrace as a *pickled* vegetable, we may refer to lexicographic definitions and technical authorities, proceedings of Congress in connection with the provision under construction, and judicial decisions under prior acts, recognizing the difference which differing tariff provisions may connote.

In the Columbia Encyclopedia, second edition, published by the Columbia University Press in 1950, there appears the following:

**pickle,** general name for fruits or vegetables preserved in vinegar, usually with spices or sugar or both. A great variety of materials and combinations have been used in many lands. * * * In the United States alone some 4,000,000 bu. of cucumbers are pickled yearly in commercial salting stations. They are commonly placed underripe in 10 percent brine, allowed to undergo a lactic acid

fermentation, soaked in hot water to remove excess salt, then covered with vinegar and other ingredients. * * *

In the same work, lactic acid is described as a colorless *liquid* compound of carbon, hydrogen, and oxygen.

Webster's New International Dictionary, 1956 edition, defines the terms as follows:

pickle, *n.* * * * 1. a  A salt-and-water solution for preserving or corning fish, meat, etc.; brine.  b  Vinegar, plain or spiced, for preserving vegetables, fish, eggs, oysters, etc.

\*      \*      \*      \*      \*      \*      \*

3. Any article of food, esp. cucumbers, that has been preserved in brine or or in vinegar; * * * .

lactic acid.  *Chem.*  A colorless sirupy acid * * *.

The Summary of Tariff Information, 1929, compiled by the United States Tariff Commission for the use of the Committee on Ways and Means, in connection with an examination of the Tariff Act of 1922, discusses pickles in the context of a liquid pack product, as follows:

### VEGETABLES PICKLED, OR PACKED IN SALT BRINE

Many vegetables are *packed in brine for preserving* them *until they are further preserved by pickling in vinegar.* Important products so handled are cucumbers or pickles and onions.  [P. 1452; emphasis added.]

### PICKLES OR CUCUMBERS

Description and uses.—Cucumbers are placed in brine for curing, graded, and then pickled in vinegar and spices to make the familiar pickle.  A number of types and kinds are produced varying in the type of pickling process employed, and the size and kind of pickle.  They are packed in containers varying from barrels to small bottles.  They find wide use in households and restaurants. [Pp. 1452, 1453.]

\*      \*      \*      \*      \*      \*      \*

Imports.—Imports of pickles consist of various vegetables mainly mixed pickles and pearl onions.  They come packed largely in small containers, although some of the onions are brought in in barrels. * * * [P. 1453.]

\*      \*      \*      \*      \*      \*      \*

Competitive conditions.—The competition is mainly in small packaged pickles, or mixed vegetables pickled in vinegar.  [P. 1453.]

### WHITE PICKLING ONIONS

Description and uses.—Small white onions are grown specially for brining and pickling.  After pickling they are used in households and restaurants. [P. 1454.]

\*      \*      \*      \*      \*      \*      \*

Imports.—Imports of white pickling onions in brine come almost entirely from the Netherlands. * * * [P. 1454.]

Examination of exhibits 1 to 6, inclusive, shows no liquid present. Indeed, even plaintiff's expert, Dr. Vaughn, conceded that, although he believed that exhibits 2, 3, and 5 were fermented in lactic acid, this was not sufficient to preserve them without salt and dehydration.

He was not even that certain as to exhibits 1, 4, and 6. Moreover, he admitted that the analysis reports (exhibits 7, 8, and 9) were valueless to support an opinion that the analyzed vegetables were fermented in lactic acid.

As to defendant's expert, Dr. Joslyn, he said the exhibits 1 to 6, inclusive, would not be recognized as pickles in marketing, although technically they might be considered an unusual *dry* form of pickle.

Plaintiff, in its brief, cites a number of cases, both in this court and the court of appeals, as favoring a judicial construction that the provision for pickles and vegetables pickled includes articles which have been preserved either by salt or vinegar. (Plaintiff's brief, p. 44.) Our review of the cases shows that none of them touched the precise issue here, namely, as to when a vegetable is prepared or preserved by pickling.

In *Sun Kwong On* v. *United States*, 1 Ct. Cust. Appls. 17, T.D. 30775, cabbages, grown in China, were cut, partially dried, salted, and rolled into balls, or were put up in hanks or bundles. They were assessed under the provision of paragraph 241, of the 1897 act, for "all vegetables, prepared or preserved, including pickles and sauces of all kinds, not specially provided for." The claim was for duty under paragraph 257, as vegetables in their natural state, not specially provided for. The court of appeals found that the salt was applied to the cabbage to season it for cooking, but mainly to preserve it, and held that the product was a vegetable, *prepared or preserved*, rather than a vegetable in its natural state. Whether or not the cabbages were prepared or preserved by pickling was not an issue, and the case does not so hold. What the court did hold was "that by reason of this salting the cabbage is indefinitely preserved * * *." (P. 18.)

In *S. Y. Tank & Co.* v. *United States*, 11 Treas. Dec. 82, T.D. 27019, the products were water chestnuts, lily bulbs, lily flowers, and bamboo shoots, all Chinese vegetable foods. Plaintiff cites as pertinent here the issue as to bamboo shoots. The record before the Board of General Appraisers described the bamboo shoots as being salted or pickled. They were classified as vegetables, prepared or preserved, under paragraph 241 of the 1897 act, and the claim was that they were free of duty under paragraph 617 as vegetable substances, crude or unmanufactured. The Board of General Appraisers held that bamboo shoots which are shown to be salted or pickled are prepared or preserved.

In *Microutsicos* v. *United States*, 2 Ct. Cust. Appls. 342, T.D. 32078, peppers in brine were imported in barrels, under the Tariff Act of 1909. That act contained a provision, in paragraph 252, for vegetables, if pickled, or packed in salt, brine, oil, or prepared in any way; and a general provision, in paragraph 253, for "pickles." The importer claimed that the peppers in brine, which were classified as vege-

tables prepared under paragraph 252, were either a fruit in brine, or fruit prepared, or a nonenumerated article. The court of appeals held that the peppers were neither a vegetable nor a fruit, but a pickle, stating:

It will be observed that the changed language of the act of 1909 in relation to this subject is something more than a mere rearrangement of words in the interest of order or form of expression. To the contrary the change is material and goes to the substance of the classification. Whereas under the act of 1897, as well as the preceding ones, pickles had been directly classified as a kind or product of vegetables, now, after a period of litigation concerning the few kinds of nonvegetable pickles, the controlling enactment is changed so as to remove pickles from the vegetables paragraph and make them a class of themselves. This seems to express a legislative intent to use the word in the sense of its common acceptation. As stated in the above definition, pickles are generally composed of vegetables, but in a few instances might be nuts or like products. In this view the amended classification would make the preparation, characteristics, and use of the articles the determinative factors as to whether they were pickles, and would not arbitrarily limit the class to vegetable products only. It is well known that the word pickles in its ordinary meaning includes some few nuts and like articles which lend themselves readily to such preparation and use. [P. 345.]

In *Godillot & Co.* v. *United States*, 2 Ct. Cust. Appls. 408, T.D. 32168, the court of appeals held that capers packed in vinegar, imported in bottles or casks, and previously held not to be a vegetable pickle under paragraph 241 of the 1897 act (*Pierce* v. *United States*, 1 Ct. Cust. Appls. 171), were pickles under the specific pickle provision of paragraph 253 of the 1909 act.

In *E. H. Locatelli* v. *United States*, 34 Treas. Dec. 243, T.D. 37573, sour oranges in brine, classified under the general provision for pickles in paragraph 201 of the 1913 act, were claimed free of duty under paragraph 488 as fruits in brine. The sour oranges were used in the manufacture of a confection, and not as pickles. It was held that this use excluded them from classification as pickles.

In *Austin, Nichols & Co.* v. *United States*, 4 Ct. Cust. Appls. 261, T.D. 33483, it seems that the issue as to capers in vinegar, imported in bottles or casks, was retried under the 1909 act, which as noted above contained both a provision for vegetables, pickled (paragraph 252), and a provision for pickles (paragraph 253). The court of appeals rejected the importer's argument that since the capers did not commercially pass under the name of pickles, they should be classified as a nonenumerated article and not as pickles.

In *Bragno & Mustari* v. *United States*, 21 CCPA 74, T.D. 46393, the court of appeals held that green peppers in vinegar, imported in hermetically sealed tins, were vegetables pickled under paragraph 773 of the Tariff Act of 1922, rather than fruits in brine, pickled, under paragraph 749, as they were classified, or nonenumerated articles under paragraph 1429, as claimed. The issue there tried was whether

green peppers were a vegetable, and the court of appeals held that they were a vegetable, in the tariff sense.

*G. Granucci & Sons* v. *United States*, 23 CCPA 122, T.D. 47990, concluded that under the *Bragno* case, *supra*, peppers in vinegar, canned, were held to be vegetables, pickled, rather than vegetables, prepared, as classified by the collector, in either case under paragraph 775, and affirmed the decision of this court overruling the protest claims for classification, under the Tariff Act of 1930, as a nonenumerated manufactured article (paragraph 1558) or as pepper, unground (paragraph 781).

Three cases, not cited in the brief of either party, should be considered. In *Suetaro Ishimitsu* v. *United States*, 29 Treas. Dec. 366, T.D. 35794, merchandise described as umeboshi, umezuke, or akaumezuke, and consisting of the plum-like fruit of the ume tree, were prepared for consumption as a relish by pickling in a brine of salt and water. Imported under the Tariff Acts of 1909 and 1913, the collector classified the merchandise as fruits preserved in their own juices under paragraph 274 of the 1909 act and paragraph 217 of the 1913 act. The importer claimed that the merchandise should be classified as fruits in brine under paragraph 571 of the 1909 act and paragraph 488 of the 1913 act; or, alternatively, as pickles or as nonenumerated manufactured articles. The Board of General Appraisers pointed out that in *Sakai* v. *United States*, 5 Ct. Cust. Appls. 159, T.D. 34196, the court of appeals had held similar articles to be fruits in brine, rather than fruits preserved in their own juices, but that in the *Sakai* case no claim was made for classification as pickles. Under the 1909 and 1913 acts, the Board was of opinion that the specific provision for pickles was broad enough to include pickled fruits, as well as pickled vegetables, if preservation in an immersion of brine constituted pickling. Citing the dictionary definition of "pickle," and relying on *Microutsicos* v. *United States*, *supra*, the Board, on a record showing that the fruit was used as a relish, as pickles are used, held that the merchandise was dutiable as pickles.

In *Sakai* v. *United States*, 5 Ct. Cust. Appls. 159, T.D. 34196, the Japanese fruits, which the court of appeals there held were fruits in brine, but which in *Ishimitsu*, *supra*, were held to be pickles, were described as follows:

The merchandise in controversy bears the name of "umeboshi" or "umezuke," and is imported from Japan. The fruit from which the umeboshi or umezuke here involved is made, is called "ume," and in color, size, and the seed which it contains, closely resembles a very small olive. The ume is picked before it is ripe and, without seeding or peeling, the fruit is packed whole in tubs or barrels with salt in the proportion of about three-fourths of a gallon of salt to a gallon of fruit. Some water is put in to dissolve the salt, but how much none of the witnesses was able to state definitely. After the fruit has been in the salt and water under pressure for 10 or 20 days, it is removed from the tubs or

barrels and dried in the sun for some days. Why the ume is put under pressure does not appear, but as the fruit is not crushed or its form changed, it is reasonable to infer that the pressure imposed is not beyond that required to keep the fruit immersed in the salt and water. *When dried the fruit is ready for domestic consumption, and need not be further processed. If, however, the umeboshi is intended for shipment or export, it is repacked in the original salty solution, to which additional water and salt is sometimes added.* [P. 160; emphasis added.]

Discussing the testimony, the court of appeals said:

* * * All the witnesses for the importers agree, and their testimony is undisputed, that the fruits after their first treatment with salt and water are ready for domestic consumption, but that if they are intended for exportation they must be put back into the solution of salt and water in order to preserve them, and certainly to achieve that object a solution of salt and water would be far more effective than would a solution of salt and fruit juice, which by reason of the juice would contain in itself elements tending to promote decomposition and not preservation of the commodity.

There may be kinds of umeboshi or umezuke packed in their own juices, but we are convinced that the importation represented by the sample submitted to us is not a fruit packed in its own juice, but a fruit in brine and therefore entitled to free entry. [P. 162.]

In *Asia Co.* v. *United States*, 11 Ct. Cust. Appls. 514, T.D. 39662, the processing of umezuke Japanese plums was described as follows:

The merchandise covered by the protests is umezuke, plums in sake dregs, and benishoga. Umezuke is made by packing the ume or Japanese plum in salt with the leaves of a plant known as shiso. The salt withdraws some of the juice from the ume or plum and thereby produces a liquor colored red by the shiso leaves in which liquor the ume or plums are allowed to remain from 20 to 30 days. The plums are then taken out of the liquor and after being dried in the sun are returned to the juice containing the shiso leaves.

The plums in sake dregs, as the name indicates, are plums which have been packed in the residue resulting from the fermentation of rice into rice wine. See "Sake," Standard Dictionary; Komada & Co. *v.* United States (215 U.S. 392).

The dregs produced by the fermentation of rice contain, of course, a percentage of alcohol, but if they are exposed to the air an oxidation ensues, which produces vinegar. See "Vinegar," Standard Dictionary and Encyclopedia Britannica.

Benishoga is uncooked ginger root which has been immersed in the juice produced by packing the ume or plum with salt and shiso leaves. The testimony shows that all three products are in their use "something like pickles."

There was evidence tending to show that they are eaten with rice, fish, and meat, and that they are used as are pickles on the American table. [P. 515.]

The collector classified this merchandise as, either, prepared vegetables under paragraph 200 or as pickles under paragraph 201 of the 1913 act. The importer made alternative claims, for the various items, under paragraph 217 as edible fruit prepared in any manner; under paragraph 218 as plums; under paragraph 235 as ginger root, unground and not preserved or candied; and under paragraph 488 as fruits in brine, not specially provided for. The board over-

ruled all the protest claims, and the court of appeals affirmed that decision.

Except for the guides used by the courts in determining what is "pickled," and certain superficial factual similarities, the decisions in the above cases afford no real assistance on the legal and factual issues before us. It is apparent that many of the cases dealt with different protest issues, differently processed merchandise, and different tariff provision. In those cases which held that vegetables, salted and pickled, were prepared or preserved, the issue of how or when a vegetable is prepared or preserved by pickling was moot by reason of the fact that the duty rate was the same on vegetables pickled and vegetables prepared or preserved in any way. The importance of the distinction here is that, for the first time, there are different duty rates for vegetables, if pickled, or packed in salt or brine, and for vegetables that are prepared or preserved in any other way.

While not decisive of the issue, so far as can be determined each of the above cases did, however, involve a liquid pack vegetable, fruit, or pickle. We have found only one case, discussed, *infra*, involving a dry pack vegetable like exhibits 1 through 6. The processes described in the *Sakai* case, *supra*, bear close resemblance to the processes described in the record here. Even in the *Sakai* case, however, the fruit was packed in a *salt and water* solution. If we accept the guides set forth in the *Microutsicos* case, what do we find? The characteristics of exhibits 1 through 6 are unlike the liquid pack that was there said to be recognizable in the market place as a pickle. The process of preparation of exhibits 1 through 6, as described in the record, is superficial, so that even the expert witnesses were hard pressed to express an opinion as to whether the respective exhibits had been pickled. As to how these Chinese vegetables are used, the record is silent, except that they are eaten, either washed or unwashed.

One case cited by plaintiff involving salted turnips, apparently from China, remains to be discussed. It is *Wing Chong Lung Co.* v. *United States*, 10 Cust. Ct. 262, C.D. 765; reversed on appeal, *United States* v. *Wing Chong Lung Co.*, 33 CCPA 36, C.A.D. 312. The salted turnips there bear marked resemblance to exhibits 1 through 6 of this case. This division described the salted turnips as consisting "of a number of small bunches of dark-brown substances in a glass jar. The bunches appear to be about 1½ to 2 inches in diameter, having a flat substance wrapped around each bunch and fastened with a narrow strip which also looks like the same material." Wing Chong Lung's manager testified that he was familiar with merchandise like that there before the court, and

\* \* \* that he had seen such merchandise in China; that it is made from turnips; that they "just take it from the ground and slice, and dry a little bit

in the sun, and put salt in it, and just roll them up"; that the product is used for eating as a vegetable and there is nothing in the exhibit that is not part of a turnip. [P. 264.]

The collector had classified the salted turnips of the *Wing Chong Lung* case under paragraph 775 of the Tariff Act of 1930 as vegetables, packed in salt, brine, or oil, or prepared or preserved in any other way and not specially provided for. The importer claimed the duty rate in paragraph 773 for turnips. The trial court found, in the evidence before it, that the salted turnips were, for tariff purposes, turnips even though preserved by salt. Under the rule of tariff construction that, where a dutiable provision names an article without terms of limitation, all forms of the article are thereby included unless a contrary legislative intent appears, the court sustained the claim for classification as turnips.

On appeal, after describing the merchandise substantially as noted above and indicating that the merchandise was indisputably turnips that had been preserved by salt, our appeals court reviewed the legislative history of paragraphs 773 and 775 and reversed the decision of the trial court, stating:

Apparently the trial court was of opinion that the expression "and not specially provided for" modifies "Vegetables" in paragraph 775. Otherwise it could not have held that the provision for turnips in paragraph 773 was an *eo nomine* provision for the imported merchandise.

A reading of paragraph 775 does not admit of the construction placed thereon by the trial court. It clearly and unequivocally states that vegetables in the form and condition described and not specially provided for are to be dutiable at the rate of 35 per centum ad valorem.

The imported merchandise is "cut," "sliced," "reduced in size," and "prepared or preserved" by means of salt, and therefore falls clearly within the provision of that paragraph * * *. [P. 37.]

While *Wing Chong Lung* may not, perhaps, control our decision here, there is, and as to this plaintiff agrees (plaintiff's brief, p. 54), marked physical resemblance between the salted turnips of that case and the merchandise of exhibits 1 through 6, now before the court. The processes by which the *Wing Chong Lung* turnips were preserved by salt and the processes applied to exhibits 1 through 6, seem to be similar.

Plaintiff reads the *Wing Chong Lung* decision as significant "because it indicates that * * * [the] salted turnips which are similar to (if not identical) to the merchandise involved herein were assessed as being under the provision for *vegetables, packed in salt*." (Plaintiff's brief, p. 54; emphasis copied.) That is not the holding, as plaintiff should know. As the trial court was careful to point out in its decision, "Neither the collector nor the appraiser filed reports * * *

and * * * [it was] unable to determine from the record under which provision in paragraph 775 the merchandise was classified." Defendant's counsel indicated that classification had been under the provision for vegetables, packed in salt, brine, oil, *or prepared or preserved in any other way* and not specially provided for. The protest claim for classification as turnips under paragraph 773 made it unnecessary for the trial court to select a more precise paragraph 775 classification, under the various alternatives suggested in defendant's brief, since each of the alternatives then took the same duty rate. Contrary to plaintiff's suggestion, as we read the opinions of the trial court and of the court of appeals, the persuasive idea was that the salted turnips of the *Wing Chong Lung* case were not so much *packed in salt* as they were *preserved by salting*. Indeed, that is what the court of appeals held.

Vegetables, allegedly the same as those now before us, were the subject of our decision in *Mutual Supply Co.* v. *United States*, 44 Cust. Ct. 75, C.D. 2155. There, for some curious and unknown reason, defendant adduced no proofs and failed to file a brief. On the one sided record before us, we found a *prima facie* case had been made in support of plaintiff's claim. The record here has been further developed and we have the assistance of a thoughtful 51-page brief filed by defendant.

The comments in the 1948 Summary of Tariff Information, cited by plaintiff, mention salted turnips and mixed salted vegetables from European countries, and also vegetables imported under Chinese and Japanese names. The summary certainly does not state whether such would be considered to be "packed" in salt or to be "preserved" by salting. Yet the modified tariff position under which plaintiff claims requires, basic to the sought for modified rate classification, that vegetables shall be either *pickled or packed in salt*. We do not find, on the proofs of record, that these vegetables, as imported, are either pickled or packed in salt. They are prepared with salt. In view of our holding, it is unnecessary to find that the vegetables here are neither cucumbers nor onions; but such is the fact.

Neither in the lexicographic meaning, nor in common language in the United States, are these what are called pickled vegetables. Nor were they, as imported, packed in salt, brine, or oil. They do not come within that phase of paragraph 775 which was carved out for rate reduction in the Annecy protocol modification.

Plaintiff has failed to overcome the presumption that the collector correctly classified the vegetables of this protest as vegetables, prepared or preserved. The protest is overruled.

Judgment will be entered acordingly.